# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

THOMAS ASCIUTTO,

      Plaintiff,

v.                                  CIVIL NO. 05-72243
                                    HON. LAWRENCE P. ZATKOFF

ALLIED WASTE SYSTEMS, INC.,
d/b/a GREAT LAKES WASTE SERVICES,
a Delaware corporation, and
BFI WASTE SYSTEMS OF NORTH AMERICA, INC.,
A Delaware corporation,

      Defendants.

_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

      This matter is before the Court on Defendants' Motion for Summary Judgment, filed on August 2, 2006. Plaintiff has responded, and Defendants have replied to the response. The Court finds that the facts and legal arguments are adequately presented in the parties' papers and the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. MICH. LR 7.1(e)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted. For the reasons set forth below, Defendants' Motion for Summary Judgment is GRANTED.

## II. BACKGROUND

Defendants are engaged in the waste disposal business. Defendant Allied Waste System owns local waste disposal companies throughout the country, including Defendant BFI. Defendants place containers at their customers' facilities, and pick up and dispose of waste from the containers. Defendants service both residential and commercial customers. Residential customer accounts are handled by customer service representatives, and commercial customer accounts are handled by inside sales representatives.

Plaintiff has been involved in selling waste disposal services for nearly twenty years. Defendants began recruiting Plaintiff in late 2002 or early 2003. At the time Defendants only employed one inside sales representative, Rick Kania. When Defendants received a commercial or industrial call, it was routed to Kania. Based on the large volume of calls Kania was receiving, Defendants decided to hire another inside sales representative. Sam Langer, the regional sales manager for Defendants, had worked with Plaintiff at Waste Management in the late 1990s, and considered him an exemplary sales representative. Langer knew that Plaintiff had existing relationships with many waste disposal brokers. The brokers enter into contracts with customers for waste disposal services. They then solicit bids from companies such as Defendants, and subcontract out the work.

Plaintiff began working for Defendant BFI at its Pontiac, Michigan facility as an inside sales representative in April 2003. Plaintiff handled incoming calls from the brokers, and also make telemarketing calls. Plaintiff was paid with a salary and commissions. All inside sales representatives were paid under the same commission plan. The sales representatives were paid a

one-time fee based on the sale: a flat fee for roll-off containers, and a percentage of the first month's fee for front-load containers.[1]  The commission was paid to the sales representative who completed and signed the service agreement.  This structure also applied to repeat sales to prior customers.

Before his employment with Defendants, Plaintiff had been working for a waste disposal company called Five Star.  Plaintiff had signed a non-compete agreement with Five Star that prohibited him from soliciting Five Star's customers in Southeast Michigan for one year after his employment with Five Star ended.  In August 2003, Five Star brought suit against Plaintiff and Defendant BFI.  Plaintiff agreed to entry of an injunction enforcing the non-compete agreement, and resigned from Defendant BFI.  Plaintiff was then hired by Defendant Allied Waste to work as an inside sales representative at its Toledo, Ohio facility.  The injunction expired in March 2004, and Plaintiff returned to work for Defendant BFI at the Pontiac, Michigan facility.

When Plaintiff returned to Pontiac, there were three other inside sales representatives working for Defendants.  There was a different commission system in place when Plaintiff returned.  As before, commissions were credited based on roll-off and front-load sales, but instead of being paid to an individual sales representative, the commissions were placed in a common pot and divided equally among the sales representatives.

Four months after Plaintiff's return to Pontiac he was terminated.  Defendants allege that Plaintiff was terminated for failing to report another sales representative who tampered with a drug test.  Plaintiff subsequently brought the instant suit, alleging that he is due commissions on sales to customers that he originally obtained for Defendants.

---

[1] A roll-off container is used for a one-time pickup, usually at construction site.  Front-load containers are used in an ongoing service agreement with industrial and commercial buildings.

3

### III.  LEGAL STANDARD

Summary judgment is appropriate only if the answers to the interrogatories, depositions, admissions, and pleadings combined with the affidavits in support show that no genuine issue as to any material fact remains and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c).  A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted).  In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial.  *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324.  The non-moving party must do more than show that there is some metaphysical doubt as to the material facts.  It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment.  *See Moore v. Phillip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

### IV.  ANALYSIS

Plaintiff alleges that he is entitled to commissions on all orders made after his termination

from buyers whom he originally procured for Defendants. Plaintiff agrees that he was paid all the commissions he was owed for the time period up until his termination. Asciutto Dep. at 47. Plaintiff claims he is entitled to the post-termination commissions under four theories: oral contract, procuring cause doctrine, promissory estoppel, and unjust enrichment.

**A.     Oral Contract**

Plaintiff's oral contract theory stems from an oral contract that Plaintiff allegedly made with Defendants after his return to Pontiac from Toledo in the spring of 2004. The oral contract allegedly arose from conversations Plaintiff had with several of his supervisors regarding his duties. However, Plaintiff has failed to identify a particular conversation where specific details of the alleged oral contract were discussed and agreed to by the parties. During his deposition, Plaintiff testified as follows:

> Q: Now, I'm just trying to find out you're obviously one party to that oral agreement, so you can agree for Tom Asciutto. Who was the person who agreed for the company, which person?
>
> A: There was [sic] many people. There was more than just one person. I mean, like I said, it was Ron Baker, Tom Hernandez, Sam Langer.
>
> * * *
>
> Q: Okay. I'm trying to find out who you made that oral agreement with. I mean, at some point in time there's not an agreement, at some point in time it comes into existence. Who did you make that agreement with?
>
> A: There was many people. There's not just one person. There's not just one person.
>
> Q: Is there one time when the agreement was reached?
>
> A: Many times.
>
> Q: And the first time was when you got back from Toledo?

5

> A: That's when it started. It was my job to take over the brokers because it was in such disarray.
>
> * * *
>
> Q: Sure. You come back from Toledo. The first time you had your conversation, your first oral agreement. It seems like there's other oral agreements with other people in the company. How many other oral agreements were there?
>
> A: It was just [my] job. My job was to handle the brokers. It was more than with just one person.

Asciutto Dep. at 43-44.

Tom Baker, one of Plaintiff's supervisors, confirmed there was an understanding that Plaintiff would be the primary contact for the brokers. Baker testified as follows:

> Q: Were any of the other inside sales reps. permitted to sell to the brokers, to sell services to the brokers?
>
> A: Sure. In Tom's absence, or if Tom was busy, they would do that, yes.
>
> * * *
>
> Q: Who made the decision that Mr. Asciutto would be dealing with the brokers?
>
> A: It was primarily myself, and John Prymack would have been involved with that.
>
> Q: Okay, and you said it was based mostly on Mr. Asciutto's having - I'm sorry, more experience than his colleagues?
>
> A: That's correct, than the inside sales -
>
> Q: Sales representatives. Was it your intent that he would be the only one that would be allowed to deal with the brokers?
>
> A: No. As I've said, he was the primary person, but at least by having him as the primary person we knew where most of the focus would be.

Baker Dep. at 61.

Marjorie Aiken, one of Plaintiff's fellow sales representatives, also confirmed it was

understood that Plaintiff would be the primary contact for the brokers.  Aiken testified as follows:

> Q: Did the other sales representatives, to your knowledge, defer to Tom when it came down to the brokers?
>
> A: Yes.
>
> Q: Was management aware of that?
>
> A: Oh, yes.
>
> Q: Did anyone from management ever tell you that the company wanted Tom to deal exclusively with the brokers?
>
> A: In so many words, yes.
>
> Q: Okay.  Why do you say in so many words?
>
> A: They didn't exclude us.  They didn't say, you know, you can't handle the brokers.  It was just basically - like I said, it was just knowing that, you know, Tom's going to be coming back, he's going to be handling a lot of the brokers and the national accounts.  We're going to get the team together, and -
>
> Q: Okay, and did he, in fact, primarily handle the brokers?
>
> A: Oh, yeah.

Aiken Dep. at 19-20.

Thus, it is undisputed that there was an understanding Plaintiff would be the primary contact for the brokers.  However, Plaintiff has failed to point to any facts that indicate the parties agreed that he would receive all future commissions from sales to the brokers he dealt with, regardless of which sales representative closed the sale.

The fact that parties have discussions regarding an individual's job responsibilities does not mean that the parties have entered into an oral contract.  To form a valid contact, "there must be a meeting of the minds on all the material facts.  A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states

of mind." *Heritage Broadcasting Co. v. Wilson Communications, Inc.*, 428 N.W.2d 784, 787 (Mich. Ct. App. 1988) (citations omitted). Plaintiff does not allege that commissions on future sales to brokers were ever agreed upon, or even mentioned, during the discussions regarding his job responsibilities. Thus, there cannot have been a meeting of the minds on this point.

Furthermore, Plaintiff's own testimony indicates that the purpose of the discussions was to discuss his job responsibilities, rather than to negotiate an oral contract.

> Q: Is there one time when the agreement was reached?
>
> A: Many times.
>
> Q: And the first time was when you got back from Toledo?
>
> A: That's when it started. It was my job to take over the brokers because it was in such disarray.
>
> * * *
>
> Q: Sure. You come back from Toledo. The first time you had your conversation, your first oral agreement. It seems like there's other oral agreements with other people in the company. How many other oral agreements were there?
>
> A: It was just [my] job. My job was to handle the brokers. It was more than with just one person.

Asicutto Dep. at 44. Because Plaintiff has failed to produce any evidence indicating that there was a meeting of the minds on an agreement to pay him commissions on future sales to brokers, this claim fails as a matter of law.

**B.      Procuring Cause Doctrine**

Plaintiff also claims that he is entitled to commissions under the procuring cause doctrine. The procuring cause doctrine was discussed by the Michigan Supreme Court in *Reed v. Kurdziel*, 352 Mich. 287 (1958). The defendant manufactured iron castings. The plaintiff claimed he had a

8

contract with the defendant to sell its castings, and that pursuant to the contract he would receive commissions on original orders from customers he procured, as well as on reorders from those customers. The *Reed* court found that "there was ample evidence by which the lower court could find that . . . plaintiff-appellee was to receive commissions on not only the original sales submitted by him but on all reorders." *Id.* at 295. The *Reed* Court held that the plaintiff's right to recover commissions was not limited by his termination: "if the authority of the agent has been cancelled by the principal, the agent would nevertheless be permitted to recover the commission if the agent was the procuring cause [of the sale]." *Id.*

> The Sixth Circuit has explained the procuring cause doctrine as follows:
>
> An agent may recover a commission for customer procurement or sales procurement. Customer procurement allows an agent to recover a commission for all sales to a customer that the agent procured regardless of whether the agent was involved in the particular sale. Sales procurement allows an agent to recover a commission only on the specific sales that the agent procures. Subsequent sales to the same customer that are not procured by the agent do not yield a commission. Whether an agent is entitled to commissions on a customer procurement or sales procurement basis is determined by the contract between the agent and the principal.

*Lilley v. BTM Corp.*, 958 F.2d 746, 751 (6th Cir. 1992).

The procuring cause doctrine was also discussed in *Clark Bros. Sales Co. v. Dana Corp.*, 77 F. Supp. 2d 837 (E.D. Mich. 1999). The plaintiff argued that its agreement with the defendants was silent on post-termination commissions, and it was entitled to commissions pursuant to the procuring cause doctrine. However, the court held that:

> [T]he Agreement expressly states that "the manufacturer shall be obligated to pay agent the commissions earned up to the date of termination." This provision explicitly defines the obligation Defendants owed to Plaintiff upon termination of the Agreement, and limits their obligation to payment of "commissions earned up to the date of termination." This language is not ambiguous, nor is it silent on the subject of post-termination commissions, merely because it fails to also state that post-termination commissions are not owed, or that Defendants must pay only the

> commissions earned before the termination date. Stated differently, no ambiguity arises from the mere fact that the parties could have phrased their obligations in both positive and negative terms, but elected to state them in only one of these two forms.
>
> * * *
>
> Defendants' express promise to pay "the commissions earned up to the date of termination" excludes any implied promise to pay other sorts of commissions, such as the post-termination commissions sought by Plaintiff.

*Id.* at 844.

The court also rejected the plaintiff's reliance on *Reed*. The court noted that some language in *Reed* could be read to "suggest that 'procuring cause' commissions must be paid in all cases." *Id.* at 848. However, subsequent cases "have declined to construe *Reed* so broadly, and instead have focuses upon *Reed's* observations that the relationship between principal and agent is 'contractual,' and that the obligation to pay commissions 'depends upon the intention of the parties and the interpretation of the contract." *Id.* (citations omitted). The court held that:

> [E]ven if the Court were to conclude that the parties' Agreement is silent or ambiguous on the matter of post-termination commissions, it would be inappropriate to write a "procuring cause" term into the Agreement absent some evidence that the parties had agreed to a procurement-based method of calculating commissions. . . . The Court is aware of no case imposing an obligation to pay procurement-based commissions in the absence of any record evidence, whether written statements or oral assurances, that the parties intended that commissions be determined on a procurement basis.

*Id.* at 849-50.

The Court further noted that the plaintiff had only a subjective belief that the parties had agreed to a procurement-based commission scheme, and there was no objective evidence supporting this belief. *Id.* at 851. The Court held that:

> [U]nder well-established principles of contract law, no enforceable obligation arises without mutual assent, and this mutual assent must be demonstrated through objective evidence of the parties' actual words and conduct. Moreover, as the party

10

>   opposing Defendants' motion, and the party that would bear the burden at trial of establishing an enforceable promise that Defendants did not fulfill, it is Plaintiff's obligation to produce evidence of the parties' alleged agreement to determine commissions through a procurement-based methodology. Having failed to produce any evidence that might satisfy this burden, and having failed to overcome the express language of the Agreement itself calling for a different methodology, Plaintiff may not go forward with its "procuring cause" theory of recovery.

*Id.* (citations omitted).

In the instant case, Plaintiff argues that he is entitled to commissions on all sales to customers that he originally obtained for Defendants. However, as in *Clark*, Plaintiff has produced no objective evidence that he and Defendants agreed to a customer procurement commission scheme. Plaintiff has produced no written documents supporting his claim, and Plaintiff has not alleged that he was ever given any oral assurance that he would receive commissions on all orders from the customers he procured, regardless of which sales representative closed the sale.

Furthermore, the commission agreement between Plaintiff and Defendants precluded the possibility that he would receive commissions on sales he did not close. It is undisputed that when Plaintiff began working for Defendants, commissions were paid to the sales representative who completed and signed the service agreement, regardless of which representative had originally acquired the customer. During his deposition, Plaintiff testified as follows:

>   Q: Say that you got a Real Estate Enterprises permanent contract for a commercial roll-off for three years, okay? If Janee or Marjorie or somebody else, whoever the person was, renewed that contract, who would get the commission?
>
>   A: We would split it because we were splitting commissions.
>
>   Q: Okay. When you weren't splitting commissions, who would get it?
>
>   A: The person that signed it up.
>
>   Q: So the person who renewed it?

11

  A: Basically, yes.  That would be a retention.

Asciutto Dep. at 212.

  After Plaintiff returned to Pontiac from Toledo, the sales representatives began splitting their commissions (all the commissions would be placed in a pot and divided equally among the representatives).  The parties are not clear on whether this was a formal agreement with Defendants that replaced the previous commission agreement, or whether it was an informal arrangement among the sales representatives.  However, neither interpretation aids Plaintiff's case.  If it was an informal arrangement among the sales representatives, it cannot be said to replace the agreement with Defendants that commissions would be paid to the representative who closed the sale.  If it was a formal agreement with Defendants replacing the previous commission agreement, it precludes the possibility of paying commissions on a procurement basis.  Since Defendants paid all the sales representatives an equal commission regardless of which representative closed the sale, Plaintiff cannot claim that he is entitled to the commission because he originally procured the customer.

  Thus, Plaintiff has failed to produce any evidence indicating that Defendants agreed he would be paid commissions on a procurement basis.  To the contrary, the words and actions of the parties clearly indicate that Plaintiff was not entitled to commissions under a procurement theory.  To hold now that Plaintiff is entitled to commissions based on a procurement theory would place him in a better position than when he was actually working for Defendants.  When Plaintiff worked for Defendants, he was first paid a commission on sales he closed, and then an equal share of the commissions generated by all the sales representatives.  At no time did Plaintiff receive a commission because he originally procured the customer.  Thus, Plaintiff cannot now be said to be entitled to commissions on a procurement basis, and his claim fails as a matter of law.

### A.     Promissory Estoppel and Unjust Enrichment

Finally, Plaintiff claims he is entitled to post-termination commissions based on the theories of promissory estoppel and unjust enrichment.  The elements of promissory estoppel are:

(1) a promise,

(2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee,

(3) which in fact produced reliance or forbearance of that nature, and

(4) in circumstances such that the promise must be enforced if injustice is to be avoided.

*Joerger v. Gordon Food Serv.*, 568 N.W.2d 365, 368 (Mich. Ct. App. 1997).  However, Plaintiff has not alleged that Defendants ever promised him that he would be paid a commission on all orders from customers he procured, regardless of which sales representative closed the order.  Thus, Plaintiff's promissory estoppel claim fails as a matter of law.

Regarding unjust enrichment, a party cannot seek commissions under this theory when there is an express agreement regarding commissions.  *Barber v. SMH (US)*, 509 N.W.2d 791, 796-97 (Mich. Ct. App. 1993).  Plaintiff does not deny that there was a commission agreement between him and Defendants; thus, this claim fails as a matter of law.

### V.  CONCLUSION

For the above reasons, Defendants' Motion for Summary Judgment is GRANTED.  Plaintiff's action is HEREBY DISMISSED with prejudice.

IT IS SO ORDERED.

                                          s/Lawrence P. Zatkoff
                                          LAWRENCE P. ZATKOFF
                                          UNITED STATES DISTRICT JUDGE

Dated: October 10, 2006

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on October 10, 2006.

                                          s/Marie E. Verlinde
                                          Case Manager
                                          (810) 984-3290